# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7969 | **DATE** | 7/7/2003 |
| **CASE TITLE** | | Cotton vs. Alexian Brothers | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] For the reasons set forth on the attached order, Bonaventure's motion for summary judgment (34-1) is granted as to plaintiffs' claims under the Illinois Forcible Entry and Detainer Act and the Chicago Residential Landlord Tenant Ordinance, (Count 2 and 3) and is otherwise denied. Cotton and Bolden's motions for summary judgment (20-1) are also denied; however, the Court finds pursuant to Federal Rule of Civil Procedure 56(d) that both plaintiffs have established a violation of their rights under HOPWA to written pre-termination notice. Status hearing set to 7/14/03 at 9:30 a.m. The previously entered restraining orders remain in effect.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | JUL 0 9 2003 | | 46 |
| ✓ | Docketing to mail notices. | | | date docketed | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| | OR | courtroom deputy's initials | 03 JUL -8 PM 4:46 | | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREGORY COTTON and
EMORY BOLDEN

    Plaintiffs,

    vs.

ALEXIAN BROTHERS
BONAVENTURE HOUSE, an Illinois
not-for profit corporation,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case Nos. 02 C 7969 and
02 C 8437 consolidated

**DOCKETED**

JUL 0 9 2003



## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Alexian Brothers Bonaventure House is a supportive residence that provides a transitional living program for people with HIV/AIDS. It receives federal funding through the Housing Opportunities for People With AIDS Act ("HOPWA"), 42 U.S.C. § 12901 *et seq.* Plaintiffs Gregory Cotton and Emory Bolden are persons living with AIDS. They reside at Bonaventure House and participate in its transitional living program. During November, 2002, Bonaventure terminated plaintiffs' residency at its facility. At that time, plaintiffs sued separately in this Court, each seeking a temporary restraining order and preliminary injunction against Bonaventure. Each alleged that his residency had been terminated without notice and a hearing as required by HOPWA and sought to be reinstated in defendant's transitional living program. Plaintiffs also sought damages for the alleged HOPWA violation, intentional infliction of emotional distress, and alleged violations of the Illinois Forcible Entry and Detainer Act and the Chicago Residential Landlord and Tenant Ordinance, as well as declaratory and injunctive relief.

On November 5, 2002, this Court granted Cotton's request for a temporary restraining order against Bonaventure House, ordering it to restore Cotton to full use and occupancy of his residence pending a hearing on his petition for a preliminary injunction. On November 20, 2002, we granted Bolden's request for a TRO, likewise ordering Bonaventure House to restore him to full use and occupancy of his residence. On December 9, 2002, the two cases were consolidated, and the restraining orders against Bonaventure House were extended through the date of this Court's ruling on plaintiffs' motion for summary judgment. The Court is now presented with the parties' cross motions for summary judgment.

### Factual Background

Bonaventure House is a voluntary transitional living program for people with AIDS. Pl's 56.1 Resp. ¶ 2. It receives ten percent of its operating expenses from the United States Department of Housing and Urban Development ("HUD") through HOPWA. *Id.*, ¶ 7. Residents must complete an application and interview prior to being accepted into Bonaventure House's program. *Id.*, ¶ 8. Once admitted, residents may stay at Bonaventure House for up to twenty-four months. *Id.*, ¶ 6. Each resident is required to contribute forty-five percent of his income to help offset operating expenses. Agreed Facts, Ex. A (Bonaventure House Resident Handbook) § 6.14. Bonaventure House provides meals to its residents. Pl's 56.1 Resp., ¶ 15. In addition, each resident is given a private room that can be locked to exclude other residents. Agreed Facts, ¶ 6. All residents share bathrooms, showering facilities and common living areas. *Id.*; Pl's 56.1 Resp., ¶ 12. Bonaventure House reserves the right to enter and inspect a resident's private room at any time. *Id.*, ¶ 10.

In addition to room and board, Bonaventure House provides on-site counseling to its

2

residents. Pl's 56.1 Resp., ¶16. Specifically, it provides public benefits counseling, assistance in executing durable powers of attorney for health care and property, assistance in connecting residents with appropriate community psychological services, and collaboration with other community based service providers to provide residents with substance abuse and mental health counseling and treatment. *Id.* It does not provide medical care to its residents, nor does it administer medication. Agreed Facts, ¶¶ 7-8.

Bonaventure House has adopted a Resident Handbook that sets forth guidelines for its transitional living program. *Id.*, ¶ 11. According to the Handbook, abusive language, violence and threat of violence are prohibited. Handbook, §§ 8.10, 8.19. A corrective action policy is in place to enforce these prohibitions. Pl's 56.1 Resp., ¶ 24. As part of the corrective action policy, Bonaventure Houses issues written or verbal warnings depending upon the nature of the infraction. *Id.* In serious situations a resident may be asked to leave the program immediately. *Id.*, ¶ 25. The Director of Programs and Services has the discretion to determine the amount of time the terminated resident has to vacate the premises. Handbook, § 10.3.

Plaintiff Gregory Cotton is a person living with AIDS. *Id.*, ¶ 12. He moved into Bonaventure House around January 24, 2001. *Id.*, ¶ 13. On October 30, 2002, Marty Hansen, a social work supervisor for Bonaventure House told Cotton that he was being terminated from the program, and that he needed to leave the building by 3:00 p.m. that day. Pl's 56.1 Stmt., ¶ 6. Hansen claims that he told Cotton that he was being terminated for "inappropriate behavior." Hansen Aff., ¶ 2. Two weeks earlier, according to Hansen, Cotton had threatened to "slice someone's throat" in the Bonaventure House dining room. *Id.* Bonaventure House did not give Cotton written notice prior to first informing him that he had to leave the premises. Agreed

3

Facts, ¶ 20.

After some negotiations between Cotton and Bonaventure's administrative staff, Cotton was permitted to stay until 6:00 p.m. Pl's 56.1 Stmt., ¶ 11. Around 5:30 p.m., Bonaventure gave Cotton a letter stating that he had to leave by 6:00 p.m. or Bonaventure House staff would call the police. *Id.*; Pl's Reply Appendix, Ex. 9 (Letter from Marty Hansen to Greg Cotton). The letter did not state any reasons why Cotton was being asked to leave. It did, however, provide Cotton with the names and phone numbers of persons to contact at two organizations that might be able to help him secure alternative housing and mental health treatment. The letter informed Cotton that he could return to Bonaventure House two days hence, on Friday, November 1, 2002 at 9:00 a.m., to receive a "detailed written explanation" why his residency was being terminated. *Id.* The letter further stated that Cotton would be allowed to appeal the decision in writing and at an appeals meeting during which he could confront witnesses with the aid of counsel. Cotton was informed that he would receive a final decision on the matter in writing by November 8, 2002, and that his belongings would be secured at Bonaventure House until that time. *Id.*

Cotton left Bonaventure House on October 30, 2002 as requested. On the nights of October 30 and 31, Cotton slept on the "L" train and in a Chicago city park. Cotton Affidavit, ¶¶ 10-14. On November 1, Cotton met with his attorney who then contacted Bonaventure and advised that she intended to file suit in federal court to restore Cotton to possession of his residence. Pl's 56.1 Resp., ¶ 35. That same day, Bonaventure House wrote Cotton a letter detailing reasons for its decision to dismiss him from the program. Def.'s 56.1 Stmt., Ex. B. The letter documented a series of examples of Cotton's behavior during his residency at Bonaventure, including behavior that Bonaventure characterized as "extreme," "negative" and "dangerous to

4

the Bonaventure community." *Id.* It stated that Cotton had been terminated because his "continuing belligerent and threatening verbal behaviors presented a threat to the Bonaventure community." *Id.*

For the nights of November 1-4, Bonaventure House paid for Cotton to stay at the Diplomat Hotel, a single room occupancy building. Agreed Facts, ¶ 22. On November 4, 2002, Bonaventure House sent Cotton a second letter, addressed to his attorney, which explained that Cotton could obtain reconsideration for participation in its program if he submitted to a psychological evaluation. *Id.*, Ex. C. On November 5, 2002, Cotton appeared before this Court arguing that Bonaventure House had terminated his residency without providing the notice and hearing required by HOPWA, and without the service of a summons and complaint as required by the Illinois Forcible Entry and Detainer Act and the Chicago Residential Landlord and Tenant Ordinance. We granted his motion for a temporary restraining order, directing Bonaventure House to restore Cotton to full use and occupancy of his residence. He continues to reside at Bonaventure House pending the outcome of the parties' motions for summary judgment.

Like Cotton, Emory Bolden is a person living with AIDS. Agreed Facts, ¶ 27. He moved into Bonaventure House on November 5, 2002. *Id.*, ¶ 25. Bonaventure asserts that on November 17, 2002, Bolden entered another resident's room uninvited and attempted to engage him in sexual contact. Hansen Affidavit, ¶ 9. It asserts that the other resident, who had been sleeping, awoke startled, rebuffed Bolden's advances, and asked him to leave. *Id.* According to Bonaventure, Bolden initially refused to leave the resident's room but eventually did so voluntarily. *Id.*

After meeting with Bolden on the morning of November 19, 2002, Bonaventure

5

terminated Bolden from its program, citing his alleged behavior on November 17. Pl's 56.1 Resp., ¶ 56. Bolden was told to leave the premises by 3:00 p.m. that day. Pl's 56.1 Stmt., ¶ 29. He packed some of his personal property and left as requested. *Id.*, ¶ 57. Bonaventure secured his remaining belongings and informed him that he could return to retrieve them later that evening. *Id.* Bonaventure did not provide Bolden with a written explanation of the reasons for his termination. *Id.*, ¶ 31; Def's 56.1 Stmt., ¶¶ 58-59. On November 20, 2002, Bolden filed suit against Bonaventure in this Court, along with a motion for a temporary restraining order. Like Cotton, he argued that Bonaventure had terminated his residence without complying with the procedural requirements imposed by HOPWA and by state and local landlord-tenant law. The Court granted his motion, ordering him to be restored to full use and occupancy of his residence. Bolden returned to Bonaventure House on the evening of November 20 and has continued to reside there since that time.

## Discussion

Before the Court now are cross-motions for summary judgment. In their complaints, Cotton and Bolden allege that Bonaventure terminated their residencies without following the procedural guidelines imposed by HOPWA, and without pursuing formal eviction actions against them pursuant to Illinois law and the Chicago Residential Landlord Tenant Ordinance. Plaintiffs further claim intentional infliction of emotional distress, alleging that the manner in which Bonaventure handled their terminations was outrageous. Plaintiffs have moved for summary judgment as to liability on all of their claims.

In its cross-motion for summary judgment, Bonaventure argues that its involuntary discharge policy complies with HOPWA regulations and that it satisfied the due process

6

requirements imposed by the Act when it terminated Cotton and Bolden from its program. Bonaventure argues that the program is not governed by Illinois landlord-tenant law and that Bonaventure is not required to comply with the Detainer Act or the CRLTO when it decides to terminate a program participant's residency. It also argues that plaintiffs have failed to produce evidence that would support a claim for intentional infliction of emotional distress.

Cross motions for summary judgment are considered separately. With respect to each party's motion, we must evaluate admissible evidence in the record in the light most favorable to the nonmoving party. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). To prevail, the moving party must demonstrate that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. But a non-moving party who bears the burden of proof on an issue must affirmatively demonstrate that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The parties here dispute some of the factual circumstances surrounding Cotton and Bolden's discharge from Bonaventure House. Fundamentally, however, the parties disagree about the legal requirements imposed on Bonaventure when it decides to discharge a participant from its program. We first address the issue of Bonaventure's due process obligations under HOPWA.

**A.    HOPWA**

    1.    "Conditions of Occupancy"

Plaintiffs argue that in terminating their residencies and discharging them from its program, Bonaventure failed to comply with the due process requirements imposed by HOPWA's implementing regulations. They also argue that Bonaventure's involuntary discharge

policy as stated in its Resident Handbook fails to comply with those regulations on its face.

Though Bonaventure concedes that it is bound by HOPWA regulations generally, it denies that it

is obligated to provide due process as prescribed by HOPWA when it terminates residents for

violating "conditions of occupancy." Alternatively, it argues that its involuntary discharge policy

and the specific procedures it followed in terminating Cotton and Bolden's residencies at

Bonaventure House demonstrate full compliance with its obligations under the Act.

The HOPWA regulation at issue provides as follows:

> (2) Violation of requirements. (i) Basis. Assistance to participants who reside in
> housing programs assisted under this part may be terminated if the participant violates
> program requirements or conditions of occupancy. Grantees must ensure that
> supportive services are provided, so that a participant's assistance is terminated only
> in the most severe cases. (ii) Procedure. In terminating assistance to any program
> participant for violation of requirements grantees must provide a formal process that
> recognizes the rights of individuals receiving assistance to due process of law. This
> process must consist of: (A) Serving the participant with a written notice containing a
> clear statement of the reasons for termination; (B) Permitting the participant to have a
> review of the decision, in which the participant is given the opportunity to present written
> objections, and be represented by their own counsel, before a person other than the
> person (or subordinate of that person) who made or approved the termination decision;
> and (C) Providing prompt written notification of the final decision to the participant.

24 C.F.R. § 574.310(e). To summarize, a participant's assistance may be terminated if he or she

"violates program requirements or conditions of occupancy." A "formal process" recognizing

the participant's right to due process of law is required for any termination "for violation of

requirements."

Seizing on § 574.310(e)(2)(ii)'s use of the term "requirements," Bonaventure equates that

term with § 574.310(e)(2)(i)'s authorization to terminate residents for violating "program

requirements" and argues that § 574.310(e)(2)(ii) does not require due process when it terminates

a participant for violating a "condition of occupancy." Bonaventure argues that its involuntary

8

discharge procedure, which does not expressly guarantee formal process, therefore complies with the regulation because a participant may be discharged under the procedure only for violating a condition of occupancy.

Leaving aside for a moment the sufficiency of Bonaventure's policies, the Court disagrees with its reading of the regulation. There is no basis to read the regulation's use of the two different terms—"requirements" and "program requirements"—to mean the same thing. A more reasonable reading is that the more general term—"requirements"—is intended to have a broader meaning than the more specific "program requirements." In any event, we are not convinced that the regulation draws any meaningful distinction between violations of "program requirements" and violations of "conditions of occupancy." As plaintiffs point out, neither of those terms are anywhere defined in HOPWA's implementing regulations. If, as Bonaventure contends, a program participant's minimum due process rights under HOPWA were meant to depend on whether the participant is terminated for violating a "program requirement" as opposed to a "condition of occupancy," it is reasonable to believe that the regulation would have offered some guidance as to the kind of rules that fall in to each category. Otherwise, a HOPWA grantee like Bonaventure could avoid its due process obligations each time it discharged a participant by simply characterizing the basis for termination as a violation of a condition of occupancy rather than a program requirement. There is no reason to believe that in promulgating regulations under a statute whose overall purpose included limiting terminations to "the most severe cases," *see* § 574.310(e)(2)(i), with the intent of ensuring that "reasonable efforts be made to intervene before terminating assistance," S. Rep. No. 101-316 at 172, *reprinted in* 1990 U.S.C.A.A.N. 5763, 5934, HUD intended to create a regulatory scheme that would be so easily manipulable.

The plain language of the regulation provides that in terminating assistance to any program participant for violation of "requirements," HOPWA grantees must provide the participant with minimum procedural due process. 24 C.F.R. § 574.310(c)(2)(ii). We understand this to mean that whenever a supportive residence like Bonaventure discharges one of its residents for failure to comply with the rules established by its program, it must provide the participant with the minimum formal process outlined in § 574.310(e)(2)(ii)(A)-(C). The question before us, therefore, is whether Bonaventure's involuntary discharge policy and the steps it took to discharge Cotton and Bolden from its program comported with its due process obligations under 24 C.F.R. § 574.310(c).

2.    Bonaventure's Involuntary Discharge Policy

We begin with Bonaventure's involuntary discharge policy. According to its Resident Handbook, a resident may be asked to leave Bonaventure House involuntarily for any of eight enumerated reasons, including participation in physical violence or abuse. Handbook, § 10.3. Under this policy, Bonaventure's Director of Programs and Services has the discretion to determine the amount of time that the departing resident has to vacate the premises. *Id.* In particularly serious situations, such as when a resident has threatened bodily harm to another person, Bonaventure reserves the right to ask the resident to leave immediately. *Id.*

Plaintiffs argue that these features of Bonaventure's policy conflict with its due process obligations. This argument is based on plaintiffs' position that § 574.310(e) does not permit post-deprivation hearings. Though the regulations are silent as to the issue of timing of a required hearing, plaintiffs assert that post-deprivation hearings are inadequate to protect the rights of Bonaventure's sick and impoverished residents, many of whom could be rendered

10

immediately homeless by the decision to terminate their residency. Plaintiffs rely on Supreme Court decisions in the area of Fourteenth Amendment procedural due process to support its argument that pre-deprivation notice and hearing are required in terminating assistance to participants in HOPWA funded residential programs. *See, e.g., Zinermon v. Burch*, 494 U.S. 113 (1991); *Goldberg v. Kelly*, 397 U.S. 254 (1970). Because HOPWA and its implementing regulations are silent on the issue, we agree that the Supreme Court's treatment of constitutional due process is instructive.

The essence of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Court has held that the extent to which Fourteenth Amendment procedural due process must be afforded to a recipient of public benefits is influenced by "the extent to which [a recipient] may be 'condemned to suffer grievous loss,' and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg*, 397 U.S. at 263 (citing *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)). An individual is presumptively entitled to notice and an opportunity for a hearing prior to the permanent deprivation of a recognized interest in liberty or property. *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)). Post-deprivation process is typically inadequate "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process.'" *Logan*, 455 U.S. at 436 (quoting *Parratt*, 451 U.S. at 539). These principles suggest that in determining the proper timing of the written notice and hearing guaranteed by HOPWA's implementing regulations, we should

consider the extent to which HOPWA grantees require the flexibility to make quick decisions regarding their program participants, the general feasibility of providing predeprivation process, the consequences to program participants of losing their assistance, and the adequacy of a written notice and hearing after termination of a program participant's benefits.

There is no doubt, as plaintiffs contend, that the consequences to HOPWA program participants of losing their assistance are serious. Participants in supportive residential programs like Bonaventure's are impoverished, suffer from AIDS related illnesses, and lack adequate housing opportunities. A resident who loses his housing assistance may face homelessness and may experience psychological stress that exacerbates his illnesses. Program participants erroneously discharged from HOPWA facilities may suffer seriously during even short periods between the time their residencies are terminated and the time of any post-deprivation hearing. From this perspective, across-the-board post-deprivation hearings would be inadequate to protect the due process rights recognized by HOPWA's implementing regulations. *Cf. Anast v. Commonwealth Apartments*, 956 F. Supp. 792, 799 (N.D. Ill. 1997) (Because an improper denial of benefits cannot be corrected easily at a later date, a pretermination hearing must be held before eviction from public housing projects) (citing *Goldberg*, 397 U.S. 254; *Caulder v. Durham Housing Auth.*, 433 F.2d 998 (4th Cir. 1970)).

On the other hand, those charged with administering HOPWA funded programs may on occasion have a legitimate need to be able to make quick decisions to protect the interests of all program participants. Bonaventure argues convincingly that in situations where a particular resident's behavior is alleged to pose an imminent threat to the safety of others, it has a legitimate interest in removing the dangerous resident immediately. Under such circumstances, it

12

may be impracticable to provide the formal hearing contemplated by HOPWA's implementing regulations until after the resident has been removed from the premises. For this reason, we cannot say that Bonaventure's involuntary discharge policy, which allows for immediate discharge in emergency situations, facially conflicts with HOPWA's due process guarantees. Absent exigent circumstances, however, we are not convinced that it is either impracticable or unduly burdensome to require HOPWA program administrators to provide its residents with a formal hearing under § 574.310(e)(2)(ii)(B) before terminating their assistance.

Written notification is a separate matter. The HOPWA regulations unambiguously require service of a written notice with a "clear statement" of the reasons for termination. The regulations do not, however, specifically state when this notice must be given. Bonaventure argues that HOPWA's silence entitles it to exercise discretion over when it must provide written notice. The Court disagrees. As we have discussed, the regulations incorporate general principles of due process. Meaningful due process typically requires pre-deprivation procedures, particularly where a recipient of public benefits stands to suffer serious consequences as a result of losing his assistance. Bonaventure has not argued that it would be difficult or impractical to provide departing residents with the written notification required by § 574.310(e)(2)(ii)(A), and the Court can conceive of no emergency (nor has Bonaventure identified any) that would prevent it from doing so. Unlike the hearing requirement, which contemplates a formal process allowing the participant to confront opposing witnesses and present written objections, providing written notification of the reasons for termination entails minimal preparation and no significant delay. HOPWA grantees are simply required to provide departing residents with "a clear statement of reasons for termination." 24 C.F.R. § 574.310(e)(2)(ii)(A). Even in cases where a resident

13

becomes dangerous and must be removed quickly, there is no reason why a HOPWA program administrator could not produce this simple notice within a few minutes.

On the other hand, it does not follow that Bonaventure's involuntary discharge policy fails as a matter of law to comply with HOPWA's due process requirements. Bonaventure's failure to provide pre-termination notice may subject it to liability in individual cases, but there is no basis to declare its policy–which is silent on the timing issue–illegal.

3. Plaintiffs' Termination

The question remains whether Bonaventure complied with its due process obligations when it discharged Cotton and Bolden from its program. We address this question separately as to each plaintiff, beginning with Cotton.

Cotton argues that he was forced out of Bonaventure House without first being provided with written notice of the reasons for his termination and without an opportunity for a hearing. Bonaventure contends that it was under no obligation to provide pre-deprivation process. As we have discussed, however, due process as that term is used in HOPWA's implementing regulations requires that Bonaventure provide departing residents with prior written notice stating the reasons for termination. *See generally, Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections .... when notice is a person's due, process which is mere gesture is not due process" ). Moreover, as previously discussed, unless Cotton posed an imminent threat to the residents and employees of Bonaventure House or some other emergency

14

or exigent circumstance existed, he was entitled to a hearing prior to being put out on the street.

The parties agree that Cotton was asked to leave Bonaventure House on October 30, 2002. On that date, he received a letter from Marty Hansen, Bonaventure's social work supervisor, informing him that he was required to vacate the premises by 6:00 p.m. Though the letter stated that he could return the next morning to receive a detailed written explanation for his termination, the letter did not state the reasons for his termination. This was insufficient under HOPWA. Cotton was entitled to a written notice containing a clear statement of the reasons for his termination before he was discharged from Bonaventure House. The letter Bonaventure mailed Cotton, a letter two days after kicking him out which stated the reasons for his termination, did not satisfy Bonaventure's obligation to provide pre-termination notice of the reasons for its actions.

The October 30 letter stated no reasons, telling Cotton only that if he wanted to he could come back the next day to get a written explanation. Nor does Bonaventure offer any evidence that it so much as told Cotton the reasons for his termination beyond accusing him of "inappropriate behavior."[1] Nor has Bonaventure even attempted to excuse the giving of prior written notice of its reasons, such as by arguing that it had to act quickly and had no time to prepare the notice–a contention that in any event would be undermined by the fact that it had more than enough time to prepare a letter telling Cotton to leave.

Cotton also argues that a pre-deprivation hearing was required; Bonaventure, for its part, contends that its offer of a post-deprivation hearing was sufficient. Determination of this issue

---

[1] Bonaventure supervisor Marty Hansen's affidavit describes what he understood the "inappropriate behavior" to be but does not say that he communicated this to Cotton. Hansen Aff., ¶ 2.

15

requires resolution of factual disputes, which we cannot do in deciding a motion for summary judgment or even in deciding cross-motions.

We next address Bonaventure's actions in terminating assistance to Bolden. According to Bonaventure, on the night of November 17, 2002, Bolden entered another resident's room uninvited, attempting to initiate sexual contact. Hansen Affidavit, ¶ 9. After Bolden allegedly touched the other resident's face, the resident awoke, rebuffed Bolden's advances and asked him to leave. *Id.* Bonaventure appears to have learned of this incident on November 18; Bolden says he got a note that day asking him to meet with Bonaventure supervisor Marty Hansen the next morning at 8:00 a.m. Bolden Aff., ¶ 9. At that meeting, Hansen told Bolden that he was being terminated for "assaulting" the other resident and that he was to vacate the premises by 3:00 p.m. *Id.*, ¶ 10. Though it prepared a letter that it later mailed to Bolden at his brother's residence, Bonaventure did not provide Bolden with written notice of any kind before he left. And it gave Bolden no indication that he was entitled to challenge the decision (either before or after his ouster), a notification clearly required by § 574.310 (e)(2)(ii)(B). For these reasons, the Court finds that Bonaventure violated Bolden's HOPWA right to pretermination written notice, a violation that Bonaventure makes no effort to excuse on the grounds that it had no time to provide proper notice (nor could it plausibly do so, given the passage of time between the incident and the November 19, 8:00 a.m. meeting with Bolden and the passage of time between that meeting and his removal from the premises).

Bolden also contends that he was entitled to a pre-termination hearing. Bonaventure contends that Bolden's behavior on November 17 indicated that he posed an imminent threat to other residents at Bonaventure House. Assuming an emergency truly existed, a pre-termination

16

hearing was not legally required, and the 45-minute meeting that Hansen had with Bolden before terminating him may have been sufficient pre-deprivation "process," so long as the formal hearing required by HOPWA was later offered. The existence of an emergency, however, is genuinely disputed and cannot be determined on summary judgment.

There is also a serious question whether Bonaventure ever intended to provide a post-termination hearing. Bonaventure argues that it intended to do so but that Bolden beat them to the punch by seeking and obtaining a temporary restraining order. But Bonaventure provides no evidence to support this argument: the affidavits of the participants contain nary a hint of such a claim or intention, and as we have noted not even the post-termination notice that Bonaventure sent mentioned any right on Bolden's part to challenge Bonaventure's actions. On the other hand, as a practical matter, the quick intervention by Bolden's counsel and the court may have made a hearing a moot point for purposes of determining the relief to which Bolden may be entitled. None of these issues, however, can be determined by the Court on summary judgment.

In sum, both plaintiffs have shown that their right to fair notice was violated, but both plaintiffs' summary judgment motions are otherwise denied, as is defendant's cross-motion.

**B.    State and Local Landlord Tenant Law**

Plaintiffs contend that Bonaventure House is governed not only by the operational guidelines established by HOPWA and its implementing regulations, but also by principles of Illinois and Chicago landlord-tenant law. They argue that in addition to providing the minimum formal process required by HOPWA, Bonaventure is required to file an action under the Illinois Forcible Entry and Detainer Act before it terminates assistance to program participants. They also argue that Bonaventure is required under the CRLTO to obtain a court order of possession

17

before it orders residents to leave its facility. Bonaventure concedes that its involuntary discharge policy, as provided in its Handbook, does not incorporate any of the requirements of the Detainer Act or the CRLTO and that it discharged plaintiffs without considering those laws. It argues, however, that it does not maintain a landlord-tenant relationship with its program participants and is therefore not required to comply with rules governing leasehold arrangements. Bonaventure insists that the procedures for discharging residents from supportive residential facilities like Bonaventure are provided for exclusively by HOPWA and the Illinois Supportive Residences Licensing Act, 210 ILCS 65/1 *et seq.*, an Illinois law that complements HOPWA. We agree with Bonaventure that landlord-tenant law does not apply to its decision to discharge participants from its program.

      1.     The Illinois Forcible Entry and Detainer Act

      The Illinois Forcible Entry and Detainer Act provides that "[n]o person shall make entry into lands or tenements except in cases where entry is allowed by law, and in such cases he or she shall not enter with force, but in a peaceable manner." 735 ILCS 5/9-101. It further provides that "[t]he person entitled to the possession of lands or tenements may be restored thereto ... [w]hen a peaceable entry is made and the possession unlawfully withheld," or "[w]hen any lessee of the lands or tenements, or any person holding under such lessee holds possession without right after the termination of the lease or tenancy by its own limitation, condition or terms, or by notice to quit or otherwise." 735 ILCS 5-9/102 (a)(2) & (4). Plaintiffs contend that the Detainer Act provides the sole means under Illinois law for settling a dispute over the possession of real property when a person has peaceably entered the property. Consequently, they argue, Bonaventure was required to bring an action under the Act before it took steps to terminate

plaintiffs' residency at its facility. In response, Bonaventure argues that application of the Detainer Act is confined to cases involving landlord-tenant relationships, and that actions under the Act are limited to resolving the issue of entitlement to possession under a lease agreement. Because plaintiffs do not stand in relation to Bonaventure as tenants, it argues, and because plaintiffs' residency at Bonaventure House is not governed by a lease, the Act does not apply.

We first address the question whether Bonaventure maintains a landlord-tenant relationship with the residential participants in its program. Bonaventure observes correctly that a landlord-tenant relationship arises from a lease agreement. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 105, 630 N.E.2d 836, 840 (1994). For purposes of the Detainer Act, a lease can arise from an oral agreement as well as written contract. 735 ILCS 5/9-214. To establish the relationship, however, possession and control of the "leased" premises must pass from landlord to tenant. *Midland Management*, 158 Ill. 2d at 105, 630 N.E.2d at 840. Plaintiffs maintain that as residents of Bonaventure House, they enjoyed possession and control of their rooms to the exclusion of others. They contend that their occupancy agreements with Bonaventure were leases and that their monthly contributions to Bonaventure House should be construed as rent.

The Court disagrees. As Bonaventure points out, its Resident Handbook states clearly that "Bonaventure House offers community living and should not be misconstrued as apartment-style living." Handbook, § 6.14. It also states that residents should not construe their relationship with Bonaventure as "akin to that of a landlord/tenant relationship." This disclaimer does not settle the issue, but it raises an important distinction between Bonaventure House and a typical apartment complex. Bonaventure House is an assisted living facility. Residents are

19

participants in a program that extends beyond simply providing housing. Though they contribute a percentage of their monthly income to offset housing costs, residents receive free meals, public benefits counseling, assistance in connecting with community psychological services, and referrals for substance abuse and mental health counseling and treatment. And while residents are given private rooms that they may lock to the exclusion of other residents, Bonaventure's administrative staff may enter a resident's room at any time.[2] *Id.* These features of Bonaventure's relationship to its residents are inconsistent with a landlord-tenant relationship. Plaintiffs cite no authority, and we can find none, that supports the notion that occupancy agreements between assisted living facilities and its residents ought to be considered leases.

We agree with Bonaventure, therefore, that the Illinois Forcible Entry and Detainer Act does not apply to its decisions to terminate Cotton and Bolden and eject them from the premises. Though plaintiffs emphasize the Act's broad language, it is designed to regulate the landlord-tenant relationship, specifically to prevent landlords from using self-help remedies to oust holdover tenants or lessees otherwise holding without right. *See* 735 ILCS 5/9-102(4) (allowing landlord to maintain forcible detainer action against lessee holding possession without right); *id.*, 9-210 (requiring landlord to give 10 days "notice to quit" before evicting tenant for default made in the terms of a lease). Though the general prohibition against forcible entry onto "lands or tenements," *see id.*, 9-101, might be thought broad enough to regulate any dispute over possession of real property, the procedural requirements for admitting and discharging residents from transitional living facilities like Bonaventure House are specifically and comprehensively provided for elsewhere in the Illinois code. As Bonaventure points out, the Illinois Supportive

---

[2] On the issue of possession and control, we also note that residents share toilets and showering facilities.

20

Residents Licensing Act, 210 ILCS 65/1 *et seq.*, provides the state regulatory framework for licensing and administering supportive residences for persons with HIV. The Act authorizes the Illinois Department of Public Health to establish "minimum standards rules and regulations that will facilitate the provision of quality residential care that is specific to the unique needs of persons with HIV Disease, while ensuring the protection of residents' rights and general welfare." 210 ILCS 65/5. The Act's implementing regulations prescribe standards that supportive residences like Bonaventure must incorporate in establishing involuntary discharge procedures. Specifically, supportive residences must adopt policies that provide for client notification and due process concerning involuntary discharge, including "timeframes between counseling, notice, and involuntary discharge consistent with the reason for the involuntary discharge." 77 Ill. Adm. Code § 385.1800. Given the focused attention of the Illinois legislature and the Illinois Department of Public Health to the procedural rights of residents of HIV supportive residences, and in the absence of authority to suggest that the Illinois Forcible Entry and Detainer Act ought to apply to assisted living facilities generally, we conclude that in terminating assistance to plaintiffs Bonaventure was obligated under state law solely to comply with the procedures prescribed by the Illinois Supportive Residences Act.[3]

2. Chicago Residential Landlord and Tenant Ordinance

Similarly, we reject plaintiffs' claim that Bonaventure was required to obtain a court order of possession under the Chicago Residential Landlord and Tenant Ordinance before it discharged plaintiffs from its program. *See* Chicago Municipal Ordinance § 5-12-160 ("[i]t is

---

[3] We note that plaintiffs have not based any of their claims on their rights under the Illinois Supportive Residences Act, and we therefore do not address whether Bonaventure's involuntary discharge policy or its actions in terminating plaintiffs comport with its obligations under the Act.

unlawful for any landlord or any person acting at his discretion knowingly to oust or dispossess ... any tenant from a dwelling unit without authority of law"). Though the ordinance applies to "dwelling units operated under subsidy programs of agencies of the United States," its coverage excludes "housing accommodations" in any "extended care facility." Chicago Municipal Code §§ 5-12-010, 5-12-020(c). The term "extended care facility" is not defined in the code. The Illinois Appellate Court, however, has recently addressed the question whether an assisted living facility for senior citizens qualifies as an "extended care facility," excluding it from coverage under the CRLTO. *Antler v. Classic Residence Management Limited Partnership*, 315 Ill. App. 3d 259, 733 N.E.2d 393 (2000). It concluded that "by exempting the category of dwellings known as 'extended care facilities,' the Chicago city council acknowledged that certain groups of individuals ... may seek or require more specialized living arrangements than are contemplated by the landlord/tenant relationship created in the ordinary lease agreement," and that those arrangements ought to be regulated separately. *Id.* at 266, 733 N.E.2d at 399. With respect to the assisted living facility at issue in the case, the court determined that the existence of various supportive services provided a sufficient basis for the conclusion that residents at the facility had entered into "provider/resident relationships" rather than landlord/ tenant relationships, and that the assisted living facility qualified as an "extended care facility" under the CRLTO. *Id.* at 267, 733 N.E.2d at 400.

We agree with Bonaventure that its transitional living facility likewise qualifies as an extended care facility. As discussed, residents at Bonaventure House are participants in a comprehensive program and receive a variety of supportive services. Procedures governing the type of supportive residence that Bonaventure operates are expressly provided by HOPWA and

the Illinois Supportive Residence Act. The CRLTO therefore does not apply to plaintiffs' terminations from Bonaventure's program.

## C. Intentional Infliction of Emotional Distress

Plaintiffs also allege that Bonaventure's actions in terminating their residencies constituted intentional infliction of emotional distress (IIED). In order to prove its claims, plaintiffs must show that Bonaventure's conduct was truly extreme and outrageous, it knew that there was a high probability that its conduct would cause severe emotional distress, and its actions in terminating plaintiffs' residencies actually caused severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988). A defendant's alleged conduct must be shown to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency." *Public Finance Corp.* v. *Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976). The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances in the case. *McGrath*, 126 Ill. 2d at 90, 533 N.E.2d at 811. The degree of control that a defendant maintains over a plaintiff is relevant to the question of whether a defendant's conduct is outrageous, as is defendant's awareness that a plaintiff is particularly susceptible to emotional distress because of a physical or mental condition. *Id.* at 86-91, 533 N.E.2d at 809-811. Both parties have moved for summary judgment on plaintiffs' IIED claims.

Plaintiffs emphasize several factors that they argue establish their claims for intentional infliction of emotional distress. They stress that Bonaventure House is a residential facility for persons with AIDS who have a history of substance abuse and low income. Because Bonaventure is in the unique position of providing its residents with basic necessities such as food and shelter as well as counseling and other support, plaintiffs contend, it has a great deal of

23

influence over its residents' well-being. Plaintiffs point out that a confirmed AIDS diagnosis is a prerequisite for admission to Bonaventure House, and that Bonaventure must have known that plaintiffs would suffer physically and emotionally as result of being forced out on such short notice. Cotton contends that as a result of Bonaventure's actions he was forced to sleep on CTA trains and in public spaces for two nights, that has experienced physical health difficulties, and that he has suffered from nightmares and depression. Bolden asserts that he feared he would be arrested if he did not leave Bonaventure House and that he felt humiliated. He claims to have suffered from depression and loss of appetite as a result of his abrupt discharge from Bonaventure's program.

Bonaventure argues that its decision to ask plaintiffs to leave Bonaventure House was reasonable, and certainly not outrageous. It insists that it removed plaintiffs to avert a threat to other residents in its community, and that it took steps to ensure that plaintiffs had a place to stay when they left. It emphasizes the high threshold for proving outrageous conduct in a claim for intentional infliction of emotional distress, citing to a case in which a court in this district dismissed an IIED claim in which a plaintiff alleged that her eviction resulted in hospitalization. *See Anast*, 956 F. Supp. at 802-803. We acknowledge that the threshold for establishing that a defendant's conduct was outrageous is high. But applying the principles discussed by the Illinois Supreme Court in *McGrath*, including the degree of control Bonaventure maintained over plaintiffs and its knowledge of their serious illnesses, we conclude that a reasonable jury could determine that Bonaventure's conduct meets the required standard. It is undisputed that Bonaventure ordered plaintiffs, both of whom were known by Bonaventure to be impoverished and suffering from AIDS related illnesses, to leave its supportive residence with only a few

24

hours' notice. The evidence is consistent with a claim that Bonaventure callously forced plaintiffs onto the street, and did so without giving them a chance to give their side of the story and without regard to whether they could find some place to stay. A reasonable jury could find this conduct to be outrageous under *Davis* and its progeny. The Court therefore denies Bonaventure's motion for summary judgment on the IIED claim.

That does not mean, however, that plaintiffs are entitled to summary judgment on this claim. Some of the material facts upon which plaintiffs base their claims are disputed. The parties dispute, for instance, whether Bonaventure took steps to ensure that plaintiffs had a place to stay when they left its facility, *see* Pl's 56.1 Resp., ¶¶ 32, 58, an issue critical to establishing whether Bonaventure knew that it was forcing plaintiffs on to the street. In any event, summary judgment for plaintiffs on their IIED claims would be inappropriate because the question of the outrageousness of Bonaventure's conduct is in these circumstances an issue properly reserved for a jury determination. *See McGrath*, 126 Ill. 2d at 92, 533 N.E.2d at 812.

## Conclusion

For the reasons stated above, Bonaventure's motion for summary judgment [Docket # 34-1] is granted as to plaintiffs' claims under the Illinois Forcible Entry and Detainer Act and the Chicago Residential Landlord Tenant Ordinance, (Counts 2 and 3) and is otherwise denied. Cotton and Bolden's motions for summary judgment [Docket # 20-1] are also denied; however, the Court finds pursuant to Federal Rule of Civil Procedure 56(d) that both plaintiffs have established a violation of their rights under HOPWA to written pre-termination notice. The case is set for a status hearing on July 14, 2003 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement. The previously entered restraining orders remain in effect through that date and may be further extended at that time.

MATTHEW F. KENNELLY
United States District Judge

Date: July 7, 2003

26